UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

VIVIAN BUCK FOR D.B.,          )
                                )
            Plaintiff,          )
                                )
        vs.                     )          No. 4:06-CV-01469 CEJ
                                )
MICHAEL J. ASTRUE[1],           )
Commissioner of Social Security, )
                                )
            Defendant.          )

MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

I.   Procedural History

On August 13, 1993, an application was made on behalf of
plaintiff D.B., a minor, for supplemental security income (SSI)
benefits under Title XVI of the Social Security Act, 42 U.S.C. §
1381 et seq.[2] (Tr. 83-85). Plaintiff was found to be disabled, and
the SSI application was approved. (Tr. 24).

On July 30, 1998, plaintiff was notified that a finding had
been made that his disability had ceased to exist and his benefits

_____

[1] Michael J. Astrue became Commissioner of Social Security
on February 13, 2007. Pursuant to Rule 25(d)(1) of the Federal
Rules of Civil Procedure, Michael J. Astrue should be
substituted, therefore, for Commissioner Jo Anne B. Barnhart as
Defendant in this suit. No further action need be taken to
continue this suit by reason of the last sentence of section
205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] A decision by Administrative Law Judge James Steitz dated
July 20, 1999, indicates that the plaintiff's maternal aunt,
Karen Shye, applied for SSI benefits on plaintiff's behalf. (Tr.
122).

would be terminated on September 30, 1998.[3] (Tr. 106, 109). On August 4, 1998, Karen Shye, plaintiff's maternal aunt, requested reconsideration of the cessation of benefits. (Tr. 103). A hearing before a disability hearing officer was held on October 20, 1998, but no one appeared on plaintiff's behalf. (Tr. 92-99). The disability hearing officer Baugh determined on the basis of medical and school records that there had been medical improvement in plaintiff's condition. (Tr. 96). She concluded that plaintiff was not disabled. (Tr. 98).

At Ms. Shye's request, a hearing before an Administrative Law Judge (ALJ) was held on March 22, 1999. (Tr. 87, 122-130). Plaintiff was not present at the hearing, but his counsel appeared on his behalf. Additionally, plaintiff's mother Vivian Cook and a friend appeared. ALJ James Steitz issued a favorable decision on July 20, 1999, finding that plaintiff's disability had existed since August 4, 1998. (Tr. 130).

In a letter dated August 9, 2002, the Social Security Administration advised Ms. Cook that plaintiff's case was subject to continuing disability review. Ms. Cook was to submit information about plaintiff's condition by August 23, 2002, and was warned that her failure to do so could result in a cessation of plaintiff's benefits. (Tr. 238-239). On August 30, 2002, the SSA

---

[3] The review of plaintiff's eligibility was occasioned by changes enacted in 1996 to provisions of the Social Security Act relating to children. (Tr. 122).

wrote that the requested information had not been received, and warned Ms. Cook that plaintiff's disability benefits would stop if the information was not submitted in ten days. (Tr. 237).

On January 6, 2003, disability examiner Paul Stuve, Ph.D., found that there was insufficient evidence to determine whether plaintiff was disabled. (Tr. 232-233). The record shows that Ms. Cook had rescheduled a continuing evaluation appointment and then cancelled the appointment just before the scheduled time, stating that plaintiff would not attend any examination. (Tr. 231). Thus, a cessation of benefits was recommended on the basis of failure to cooperate and insufficient evidence. (Tr. 231).

On January 10, 2003, SSA advised plaintiff that his SSI benefits would cease in March 2003. (Tr. 226-27). On January 18, 2003, Ms. Cook requested reconsideration of the benefits cessation decision and a hearing (Tr. 224). A hearing was held before Disability Hearing Officer (DHO) Bill Lentini on May 29, 2003. (Tr. 208). Ms. Cook attended and testified on plaintiff's behalf. (Tr. 208-9). The DHO determined that plaintiff's medical condition had improved because his symptoms were controlled with medication, and no significant functional restrictions were noted in his school reports. (Tr. 212). The cessation of benefits was affirmed on May 30, 2003. (Tr. 217). On June 4, 2003, Ms. Cook requested a hearing before an Administrative Law Judge. (Tr. 287).

A hearing was held before ALJ James Seiler on June 15, 2004. (Tr. 421-434). ALJ Seiler found plaintiff not disabled on September 14, 2004. (Tr. 12). The Appeals Council denied plaintiff's request

for review on August 9, 2006. (Tr. 2). Accordingly, ALJ Seiler's decision stands as the Commissioner's final decision. See 42 U.S.C. § 405(g).

## II. **Evidence Before the ALJ**

Plaintiff was born in October 1990, addicted to crack cocaine. The Missouri Division of Family Services (DFS) intervened, and took plaintiff into custody when he was approximately eight months old. (Tr. 29, 45, 124, 255). Plaintiff was later returned to his mother's custody, but when she began abusing drugs, he was removed from her care for two years. (Tr. 124). Plaintiff's aunt Ms. Shye stated that plaintiff was later returned to his mother, and then DFS took custody again. (Tr. 255). When plaintiff was three years old, he was placed in the custody of his father. (Tr. 255). In June 1998, Ms. Shye reported that plaintiff's father had abandoned him and was using drugs. (Tr. 255). According to Ms. Shye, plaintiff came to live with her because his mother was unable to care for him. (Tr. 255).

The record shows that plaintiff was living with a foster parent in February 1992. (Tr. 33, 124). In May 1992, plaintiff's mother had physical custody of plaintiff, but DFS had legal custody. (Tr. 65). Plaintiff was in foster care in July 1992, and a social worker noted at that time that both of his parents were incarcerated.[4] (Tr. 75). On July 5, 1992, a court ordered that

---

[4] It appears that plaintiff had two foster homes and moved to the second home some time after July 1992. (Tr. 29, 46-51, 75).

plaintiff be placed in the custody of DFS due to abuse and neglect. (Tr. 61, 75).

In an evaluation dated April 6, 1992, the Missouri Department of Mental Health found that plaintiff had significant subaverage intellectual functioning, significant impairment in adaptive behavior, and had a developmental disability. The state agency also determined that plaintiff exhibited "at least a 50% delay in social, language, self help, and cognitive development." (Tr. 66).

Plaintiff's foster mother completed a questionnaire for the Department of Mental Health in September 1993. (Tr. 46-51). She reported that plaintiff, then a month shy of three years old, did not understand instructions and required supervision in everything he did. She also reported that plaintiff was well-behaved and that he would sit in one place all day if no one told him to get up. Plaintiff had no problems seeing or hearing, but his speech could not be understood, because his voice was very low and he did not speak clearly. The foster mother reported that plaintiff got along well with her older child, but that he was often angry with and hit her five-year-old child. Finally, she reported that plaintiff did not take care of his personal needs (e.g., bathing, brushing teeth, and using the toilet) as well as other children his age. The plaintiff's mother alleged that plaintiff had been abused while in foster care, and that he was returned to her custody in 1996. (Tr. 124-25).

Plaintiff entered kindergarten in October 1995. (Tr. 349). In May 1996, the school placed plaintiff in the Self-Contained Early

Childhood Special Education program with occupational therapy. (Tr. 345). In March 1997, plaintiff underwent an evaluation of his cognitive, behavioral, and learning abilities. (Tr. 354-57). The evaluators found that plaintiff functioned in the borderline range of cognitive ability, that he functioned at the kindergarten level in reading and arithmetic and at the pre-school level in spelling. (Tr. 356). The evaluators noted that these results were "inconsistent with [plaintiff's] classroom work and observations." (Tr. 356). They indicated that plaintiff's adaptive behavior was not an area of concern. (Tr. 356). Plaintiff's teachers reported to evaluators that he had poor listening skills, was easily distracted, had poor task completion, and that left his seat without permission and inappropriately talked during class. (Tr. 356). The school staff believed that his behavior could be managed in a regular school setting, as opposed to special education setting. (Tr. 356).

A Psychological-Educational Assessment in April 1997 indicated that plaintiff had "behavior problems in the areas of interpersonal relationships, distractibility, following classroom rules and cooperation." (Tr. 350). He had moderate to serious problems related to "aggression towards peers, distractibility, disruptiveness, low frustration, interpersonal relationships," and an area of concern was his ability to complete tasks. (Tr. 350). Plaintiff's teachers reported he had been defiant, disruptive, attention-getting, and aggressive in the classroom. (Tr. 351). Plaintiff's parent told teachers that at home, he was nervous,

disobeyed rules and lied, engaged in hitting and fighting, and had difficulty expressing himself. (Tr. 351). The parent also said that he wet the bed, had difficulty understanding directions, and was overactive. (Tr. 351). On the basis of the evaluation, the school determined that plaintiff was non-disabled. (Tr. 357).

In June 1998, plaintiff's aunt, Ms. Shye, noted that he was taking medication for Attention Deficit Hyperactivity Disorder (ADHD), and that the medicine slowed him down enough that he could stay in school and focus better. However, the medication made him tired, sluggish, and irritable. (Tr. 258-59). Without the medicine, Ms. Shye said, plaintiff was "incapable of controlling his own behavior" and was "constantly disrupting school and home activities." (Tr. 259). Ms. Shye indicated that plaintiff had limited ability to communicate, his ability to progress in learning was limited, his impairment affected his ability to help himself and cooperate with others in taking care of personal needs, and he had limited ability to pay attention and stick with a task. (Tr. 266-70).

Ms. Shye stated later, in August 1998, that plaintiff had to be followed closely to complete his chores, required assistance to use the bathroom, was careless and consequently endangered himself when playing, and was "so disagreeable he gets in fights with other kids at the drop of a hat." (Tr. 158). Ms. Shye reported that

plaintiff had been diagnosed with ADHD, Behavior Disorder (BD), and hyperactivity.[5] (Tr. 155).

Two teachers, as well as the school principal, submitted reports or evaluations of plaintiff during the 1998-1999 school year. (Tr. 310-17). All three stated that plaintiff was intelligent and capable, but his ability to follow rules and behave appropriately depended on whether he was taking his medication or not. (Tr. 310-17). The school principal wrote that when plaintiff was not taking his medication and when his home environment was unstable, he became "a disruptive child whose behavior is totally unacceptable." (Tr. 316).

In March 1999, one of the teachers reported that plaintiff was constantly disruptive in class, acted impulsively without apparent self-control, was unable to sit still, talked at inappropriate times, and had been suspended from school for fighting. (Tr. 383). The teacher stated that plaintiff's behavior improved when he was

---

[5] ADHD is a disorder characterized by "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequently displayed and more severe than is typically observed in individuals at a comparable level of development." Diagnostic and Statistical Manual of Mental Disorders, 4th ed., Text Revision (American Psychiatric Association, 2000) (hereinafter DSM-IV-TR), 85. The DSM does not recognize a condition called Behavior Disorder. Conduct Disorder, which is characterized by "a repetitive and persistent pattern of behavior in which the basic rights of others or major age-appropriate societal norms or rules are violated." Id. at 93. The behaviors fall into four groupings: (1) "aggressive conduct that causes or threatens physical harm to other people or animals," (2) "nonaggressive conduct that causes property loss or damage," (3) "deceitfulness or theft," and (4) "serious violations of rules." Id. at 94.

on medication, but that without medication, he would continue to show problem behavior and miss school. (Tr. 383).

In April 1999, an assessment completed by the same teacher indicated that plaintiff had severe problems on a daily basis with being easily distracted, had difficulty with time-management, performed his work carelessly, socialized at inappropriate times, and had difficulty making transitions. (Tr. 400-401). The teacher also noted severe problems on a daily basis with plaintiff's ability to follow rules, and stated that plaintiff talked at inappropriate times, appeared fidgety or restless, and left his seat or the room without permission. The teacher felt that plaintiff's behavior hindered him from turning in good work. Plaintiff had severe, daily problems with being physically and verbally aggressive towards others, bullying others, acting impulsively, and demanding immediate responses from other. Plaintiff had moderate difficulty making friends and mild difficulty responding inappropriately to comments from others.

In May 1999, school administrators and plaintiff's mother completed an alternative intervention strategy to address plaintiff's poor handwriting, impulsive and physically aggressive behavior, and his failure to follow class and school rules. (Tr. 397).

In August 2002, plaintiff's mother reported that plaintiff had continuing problems with concentration, carelessness, and aggressive behavior. (Tr. 189-92).

Plaintiff's aunt accompanied him to an psychiatric evaluation conducted by Thomas Davant Jones, Ph.D., in April 2003.[6] (Tr. 360-64). Ms. Shye reported that plaintiff was disruptive at school and at home and displayed what Dr. Jones described as "significant disobedience and oppositionality." (Tr. 361). Plaintiff left home without permission and engaged in "sabotage," such as cutting the cable on the home television or removing the batteries from the phone, if he was deprived of television or phone privileges. (Tr. 361). Dr. Jones noted that "there has been fire starting and he is aggressive if not cruel to animals," in addition to "stealing and threatening of others with violence to get what he wants." (Tr. 361).

Paul W. Rexroat, Ph.D., performed a psychiatric evaluation of plaintiff on June 30, 2004. (Tr. 413). Dr. Rexroat noted that plaintiff's mother, who accompanied him to the evaluation, reported that plaintiff set a couch on fire when he was five years old, had "keyed" cars in the neighborhood, and was mean to the family dog, "pulling his tail and pulling him up by his legs, even though the dog has bad hips." (Tr. 415). Plaintiff's mother also reported that he had frequent mood swings, was hyperactive, and could not finish school assignments, even with medication. (Tr. 414).

---

[6] The record refers to the woman who accompanied plaintiff as "claimant's aunt, Ms. Cheryl Reed." (Tr. 360). This appears to be error, as numerous other sources in the record indicate that plaintiff's aunt is Karen Shye. Forms completed by Ms. Shye indicate that Cheryl Reed is or was plaintiff's neighbor and a family friend. (Tr. 251, 304).

The hearing finding that plaintiff was no longer disabled occurred on June 15, 2004. (Tr. 421-34). Plaintiff and his mother were the only witnesses; plaintiff was represented by counsel.[7] (Tr. 421). At the time of the hearing, plaintiff was 13 years old, and he lived with his mother and maternal aunt. (Tr. 16, 17). Plaintiff attended school regularly and would enter the eighth grade in the fall. (Tr. 425). He testified that he played sports in the playground and participated in activities such as band, drama, and Boy Scouts. (Tr. 425). Plaintiff testified that he was taking Lithium and Seroquel and was under the care of M. Muddasani, M.D., who had treated him nearly his "whole life."[8] (Tr. 426-27). Plaintiff stated that he did not get any other kind of treatment, such as counseling. (Tr. 427). He said he did regular chores, such as taking the trash out and cleaning. (Tr. 427).

---

[7] The ALJ's decision states that the plaintiff's brother, Phibian Buck, testified at the hearing. (Tr. 17). This appears to be error, as the transcript shows that the only witnesses at the hearing were plaintiff and plaintiff's mother, Vivian Cook. (Tr. 421-434). Further, no evidence in the record indicates that plaintiff has a brother.

[8] Lithium is an anti-manic agent that is used to treat and prevent episodes of mania in people with bipolar disorder. Medline Plus, United States National Library of Medicine and the National Institutes of Health, *available at* http://www.nlm.nih.gov/medlineplus/druginformation.html (last accessed March 5, 2008) (hereinafter <u>MedLine</u>). Seroquel is a psychotropic medication in the dibenzothiazepine family that is used to treat bipolar disorder. <u>Physicians Desk Reference</u> 3451-53 (62d ed. 2008), 3451-53 (hereinafter <u>PDR</u>).

At the hearing, plaintiff's mother testified that plaintiff lived with her and his aunt. (Tr. 428). Ms. Cook testified that plaintiff was constantly disruptive in school and was placed in the Intensive Learning Center, a separate class for students with behavior problems. (Tr. 428-29). She also stated that plaintiff had been suspended from school at least once a year every year since kindergarten. (Tr. 429-30). Ms. Cook testified that plaintiff had made verbal threats against her, which often occurred when she tried to discipline him, and that he had shoved her once, two months earlier. (Tr. 431). Finally, plaintiff's mother testified that plaintiff had twice been accused of molesting a little boy. (Tr. 430-31).

### III.    Medical Evidence

The Court's role in this action is to determine whether there was substantial evidence in the record to support the ALJ's determination that plaintiff's medical condition had improved. Because the Court must review ALJ Seiler's finding that the plaintiff's medical condition improved between 1999 and 2004, a brief summary of the earlier evidence follows.

Plaintiff was found to be disabled in 1993. (Tr. 122). Amended Social Security Act provisions relating to children were enacted in 1996, and SSA determined that plaintiff was no longer disabled under the new regulations. (Tr. 122). Plaintiff requested reconsideration and a hearing by an ALJ. (Tr. 122).

In his 1999 decision, ALJ Steitz determined that the plaintiff, then eight years old, was still disabled. (Tr. 130). The ALJ determined that plaintiff was diagnosed with oppositional defiant disorder (ODD) and depressive disorder.[9] (Tr. 125). While these were "severe" impairments, they did not meet or equal in severity a Listed Impairment. (Tr. 125). The ALJ then determined that plaintiff had "marked" functional limitations in the areas of cognition/communication, social, personal, and concentration, persistence, and pace. (Tr. 126). Judge Steitz specified "the claimant's borderline intellectual functioning, great social inappropriateness, his obsession with cruelty to animals, fascination with genitalia, and his marked inability to maintain concentration, persistence, and pace" as areas of marked functional limitation. (Tr. 126). Judge Steitz concluded that because plaintiff had "marked" limitations of functioning in at least two areas, he was disabled. (Tr. 129).

---

[9] Oppositional Defiant Disorder is characterized by "a recurrent pattern of negativistic, defiant, disobedient, and hostile behavior toward authority figures that persists for at least 6 months . . . and is characterized by the frequent occurrence of at least four of the following behaviors: losing temper, arguing with adults, actively defying or refusing to comply with the requests or rules of adults, deliberately doing things that will annoy other people, blaming others for his or her own mistakes or misbehaviors, being touchy or easily annoyed by others, being angry and resentful, or being spiteful and vindictive." DSM-IV-TR at 100 (internal citations omitted). Depressive Disorder-Not Otherwise Specified is a category that "includes disorders with depressive features that do not meet the criteria for Major Depressive Disorder, Dysthymic Disorder, Adjustment Disorder with Depressed Mood, or Adjustment Disorder with Mixed Anxiety and Depressed Mood," or as part of "Anxiety Disorder Not Otherwise Specified." Id. at 381.

Judge Steitz considered treatment notes by Dr. Muddasani, plaintiff's treating psychiatrist, and the consultative opinion provided by James T. Hurley, Ph.D., on April 4, 1999. Dr. Muddasani diagnosed plaintiff with ADHD and enuresis (bed-wetting). (Tr. 378-82). He noted that plaintiff was unable to sit still in class, hurt himself and was accident-prone, and had been suspended from school. (Tr. 381).

In April 1999, Dr. Hurley performed a psychological evaluation of plaintiff. (Tr. 384-88). Dr. Hurley noted that Dr. Muddasani had diagnosed plaintiff with ADHD, depression, and bed-wetting, and had prescribed Wellbutrin and DDAVP for bed-wetting.[10] (Tr. 385). Dr. Hurley stated plaintiff had been taking Ritalin, but the treatment was discontinued.[11] (Tr. 385). Dr. Hurley diagnosed plaintiff with Depressive Disorder-Not Otherwise Specified, ADHD, and Oppositional Defiant Disorder. (Tr. 386). He found plaintiff's Global Assessment of Functioning (GAF) score was 50.[12] (Tr. 386). Dr. Hurley expressed his opinion that psychiatric care and medication "seems to have minimal impact on his behavior problems." (Tr. 386).

---

[10] Wellbutrin is an antidepressant used to treat major depressive disorder. PDR at 1611-13. DDAVP is used to treat diabetes insipidus and to control excessive thirst and the passage of an abnormally large amount of urine. MedLine.

[11] Ritalin is a trade name for Methylphenidate, which is a central nervous system stimulant used to treat attention deficit hyperactivity disorder. MedLine.

[12] A Global Assessment Functioning score is a score on a 0-100 rating scale of psychological functioning. DSM-IV-TR at 34. A GAF score in the 41-50 range indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)." Id.

Dr. Hurley continued:

> [Plaintiff] defies authority, has problems with peers and exhibits significant deficits in adaptive behavior. He has difficulty with cognitive functioning with deficits in memory, concentration, sustained concentration, persistence, and pace. He shows depressive behavior and I would suspect that some of his acting out is related to depression. I told the mother that he should be seeing a therapist as well as the psychiatrist.

(Tr. 387). Finally, Dr. Hurley explained that although the St. Louis Public Schools had found plaintiff to be eligible for special education, his mother had resisted, because she did not want plaintiff to be "labeled."[13] (Tr. 385). Dr. Hurley urged her to reconsider. (Tr. 387). Plaintiff's prognosis remained "very guarded." (Tr. 387).

Other medical evidence in the record post-dates the 1999 decision by ALJ Steitz.

At the request of Disability Determinations, Thomas Davant Johns, Ph.D., performed a psychiatric evaluation of plaintiff in April 2003. (Tr. 360-64). Dr. Johns diagnosed plaintiff with ADHD "with significant benefit from stimulant medication." (Tr. 364). He assessed plaintiff's GAF at 68 and stated his prognosis was guarded to fair.[14] (Tr. 364). Dr. Johns' clinical impression was that plaintiff was "mildly to . . . moderately impaired in his ability

---

[13] Dr. Hurley's finding on this point contradicts other evidence in the record that indicates that plaintiff was not eligible for special education. (Tr. 356, 360).

[14] A GAF score in the 61-70 range indicates "Some mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV-TR at 34.

to perform adequately in a regular school setting." (Tr. 364). Plaintiff's ability to relate to others, including fellow students and teachers, was "mild to moderately impaired." (Tr. 364).

Dr. Muddasani's notes from March, July, September, and December of 2003 indicate that plaintiff was engaging in sexually inappropriate behavior and continued to be diagnosed with ADHD. (Tr. 395-96). A Child's Functional Assessment form completed by Dr. Muddasani in February 2004 indicated that plaintiff had "marked" limitations in the areas of acquiring and using information, caring for self, and moving and manipulating objects. (Tr. 390-91). Dr. Muddasadi indicated that plaintiff was functioning at the second-grade level, although he was in seventh grade. (Tr. 390). Plaintiff had "extreme" limitations in attending to and completing tasks, and in interacting and relating to others. (Tr. 391). Dr. Muddasani inserted a note in the margin indicating plaintiff was hypersexual, and that he was exposing his buttocks and genitalia. (Tr. 391). Finally, Dr. Muddasani found no evidence of limitation of plaintiff's health and physical well-being. (Tr. 391). He noted that plaintiff was diagnosed with bipolar disorder, ADHD, and developmental learning disability. (Tr. 391).

In June 2004, at the request of Disability Determinations, Paul W. Rexroat, Ph.D., performed a psychological evaluation of plaintiff. (Tr. 413-16). Dr. Rexroat indicated that plaintiff had been taking Lithium and Seroquel for the past six months. (Tr. 414). He noted that Dr. Muddasani had diagnosed plaintiff with ADHD and bipolar disorder, and that plaintiff took medication for the

bipolar disorder, but the "medicines have had no positive effect on his behaviors." (Tr. 414-15). Dr. Rexroat diagnosed plaintiff with Conduct Disorder and indicated his GAF score was 59.[15] (Tr. 416).

Dr. Rexroat reported that plaintiff attended Intensive Learning Center classes, had behavior problems at school, and had been accused of making sexual comments to young children in his neighborhood and at school. (Tr. 416). He stated plaintiff had mild to moderate limitations in the area of school functioning, moderate limitations in social functioning, and moderate to marked limitations in the area of activities of daily living. (Tr. 415-16). Both plaintiff and his mother denied that plaintiff experienced symptoms of depression. (Tr. 414).

## IV.   **ALJ's Decision**

Administrative Law Judge Seiler presided at plaintiff's administrative hearing, and made the following findings:

1.   The claimant is 13 years old. The claimant has never engaged in substantial gainful activity. The claimant has experienced medical improvement in his condition. No exception to medical improvement applies.

2.   The allegations of continuing disability are not credible.

3.   The claimant has the medically determinable impairment of a conduct disorder.

4.   The claimant has a severe impairment, but does not have an impairment or combination of impairments that meet or medically equal any appropriate impairment contained

---

[15]   A GAF score in the 51-60 range indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

within the Appendix 1, Subpart P, Listing of Impairments. The claimant does not have an impairment or combination of impairments that functionally equals the listings.

5.  The claimant does not have an impairment, or combination of impairments, which result in marked and severe functional limitations.

6.  The claimant is no longer disabled, as defined in the Social Security Act and Regulations. His disability ceased March 15, 2003.

(Tr. 22).

## V.    **Discussion**

The Social Security Administration (SSA) may conduct periodic reviews to determine whether benefit recipients continue to be disabled. 20 C.F.R. § 416.989 (2004). SSA periodically reviews recipients whose impairments are expected to improve or are not considered permanent. 20 C.F.R. § 416.990(d).

The SSA asks the following questions when determining whether a disability continues for children:

1.  Has there been medical improvement?

2.  If there has been medical improvement, does the impairment still meet or equal the severity of the listed impairment that it met or equaled before?

3.  If there has been medical improvement but the impairment does not still meet or equal the severity of the prior listed impairment, is the claimant disabled under the rules in § 416.924(c) and (d)? This determination considers all impairments a claimant has, including those the claimant did not have at the time of the favorable determination, or which were not considered at that time. The SSA will ask (i) whether the claimant has a severe impairment or combination of impairments, and if so, (ii) whether the impairment meets or medically equals the severity of any impairment listed in appendix 1 of subpart P of part 404 of this chapter (if yes, the disability continues, and if not, the disability has ended).

See 20 C.F.R. § 416.994a(b)(2).

Medical improvement is "any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s)." 20 C.F.R. § 416.994a(c). Symptoms are claimant's "own description" of "physical or medical impairment." 20 C.F.R. § 416.928(a). Signs are "anatomical physiological, or psychological abnormalities which can be observed, apart from" claimant's own statements. 20 C.F.R. § 416.928(b).

> Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated.

Id. Laboratory findings are "anatomical, physiological, or psychological phenomena which can be shown by the use of a medically acceptable laboratory diagnostic techniques," including "psychological tests." 20 C.F.R. § 416.928(c). For children, the definition of symptoms, signs, and laboratory findings "may include any abnormalities of physical and mental functioning" that were used in making the most recent favorable decision. 20 C.F.R. § 416.994a(c)(2).

### A.   Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145,1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050

(8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001), <u>citing</u> <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000).

**B.    <u>Plaintiff's Allegation of Error</u>**

Plaintiff raises a single claim of error: that the ALJ's decision failed to properly consider the medical evidence in concluding plaintiff's condition was no longer of sufficient severity to be found disabled. Plaintiff argues that the ALJ improperly discarded the opinion of the treating physician, Dr. Muddasani, and failed to develop the record when he did not request further information from Dr. Muddasani to clarify the inconsistency between Dr. Muddasani's notes and the opinion he rendered.

Defendant responds that the ALJ properly considered all the evidence of record and did not give Dr. Muddasani's opinion controlling weight because it was inconsistent not only with his treatment notes, but also with the opinions and findings of other physicians, plaintiff's teachers, his mother, and his own testimony. Defendant maintains that the ALJ was not required to request more information from Dr. Muddasani unless the evidence was insufficient to determine whether plaintiff was disabled.

**1.    <u>Weight Given to Treating Physician's Opinion</u>**

The ALJ disregarded Dr. Muddasani's opinion that the plaintiff had marked or severe limitations in several function areas because the opinion was inconsistent with Dr. Muddasani's own treatment

notes and the record as a whole. (Tr. 18-19). ALJ Seiler observed that the treatment notes showed that plaintiff denied any sexual misconduct and that his condition overall improved with treatment. (Tr. 19). The ALJ also found that recent school records showed that plaintiff "did not have limitations in relating with others" and did not "seek regular and sustained treatment for a conduct disorder or any other condition, detracting from credibility." (Tr. 19). The ALJ concluded that Dr. Johns found that plaintiff had mild to moderate social functioning limitations and engaged age-appropriately in daily living activities, while Dr. Rexroat assessed plaintiff's GAF score at 59, "consistent with only moderate limitations due to a conduct disorder." (Tr. 19). The ALJ found that these assessments detracted from the opinion of Dr. Muddasani that plaintiff had "marked" limitations in the areas of acquiring and using information, caring for self, and moving and manipulating objects; and "extreme" limitations in attending to and completing tasks, and in interacting and relating to others.

Eighth Circuit law on this issue is as follows:

A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. . . . In fact, it should be granted controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. . . . By contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence."

Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citations omitted). This rule applies to opinions of treating psychiatrists and treating psychologists. See 20 C.F.R. § 404.1527(a)(2)

(referring to physicians, psychologists, and other treating sources).

"Whether the ALJ grants a treating physician's opinion substantial or little weight . . . the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluations." Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000), citing 20 C.F.R. § 404.1527(d)(2). The ALJ's function is "to resolve conflicts among 'the various treating and examining physicians.'" Bentley v. Shalala, 52 F.3d 784, 785 (8th Cir. 1994) (citations omitted). "While the opinions of treating physicians are entitled to special weight, they do not automatically control, since the record must be evaluated as a whole." Id.

The Court finds that the ALJ gave good reasons for disregarding Dr. Muddasani's opinion. ALJ Seiler provided a detailed explanation for the weight given to Dr. Muddasani's opinion, and specifically noted why and how it was contradicted by the opinions of the two consultative psychiatrists who examined plaintiff personally. The ALJ also considered the evidence in the record from plaintiff's school. The Court finds that ALJ properly evaluated the record as a whole, and his reasons for disregarding Dr. Muddasani's opinion were clearly explained and supported by the record.

As defendant correctly argues, the ALJ was not required to seek more information from Dr. Muddasani unless there was insufficient evidence in the record to determine that plaintiff was not disabled, or after weighing the evidence the ALJ could not

decide whether the plaintiff was disabled. <u>See</u> 20 C.F.R. § 404.1527(c)(3). ALJ Seiler's failure to request further information from Dr. Muddasani thus was not error.

**VI. <u>Conclusion</u>**

The ALJ's decision was not based on legal error, and there is substantial evidence in the record as a whole to support to conclusion that plaintiff's medical condition had improved.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff his complaint and his brief in support of the complaint is **denied.**

A separate judgment in accordance with this order will be entered this same date.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 24th day of March, 2008.